IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


DONALD JACOBS and          *
NORMA JACOBS

        Plaintiffs          *

        vs.                 *   CIVIL NO.  H-02-1450

JOHN H. RHOADS and          *
MICHAEL G. SEWELL
                            *
        Defendants

        *       *       *   o0o       *       *       *


<u>MEMORANDUM OPINION</u>


    Donald Jacobs ("Jacobs") has been employed for many years by
the Maryland Department of Natural Resources ("DNR") as a police
officer.  Joined by his wife Norma, Jacobs filed a complaint in a
state court asserting claims under 42 U.S.C. § 1983 and under state
law against the DNR, John W. Rhoads ("Rhoads") and Michael G.
Sewell ("Sewell"), who are also employees of the DNR.  In their
complaint, plaintiffs seek damages for injuries[1] sustained as a
result of the investigation and prosecution of plaintiff Jacobs for
the alleged theft by him of $200.

    This action was originally filed in the Circuit Court for
Baltimore City and was subsequently removed to this Court by
defendants Rhoads and Sewell pursuant to 28 U.S.C. § 1441, <u>et</u> <u>seq.</u>

---

    [1]Jacobs' wife Norma is here seeking a recovery for loss of
consortium.

on the ground that federal question jurisdiction exists under 28 U.S.C. § 1331.   Rhoads and Sewell are now the sole defendants, inasmuch as the Court in its Memorandum and Order of May 31, 2002, dismissed all claims asserted by plaintiffs against defendant DNR.

Presently pending before the Court is a motion for summary judgment filed by defendants Rhoads and Sewell.   Memoranda and exhibits have been submitted by the parties in support of and in opposition to defendants' motion.   A hearing has been held in open Court.   For the reasons stated herein, defendants' motion for summary judgment will be granted as to plaintiffs' federal claims, and plaintiffs' state law claims will be dismissed without prejudice.

I

Plaintiffs' Claims

There are eight counts in the complaint, only one of which has been brought under federal law.   Count One seeks a recovery for malicious prosecution while Counts Two and Three assert claims of false arrest and false imprisonment.   Count Four seeks a recovery for defamation, and Count Six alleges a violation of Article 24 of the Maryland Declaration of Rights.   The only federal claim in the complaint is contained in Count Seven which seeks a recovery under 42 U.S.C. § 1983.[2]

As relief, plaintiffs seek compensatory damages in the amount

_____

[2]Counts Five and Eight are not separate substantive causes of action but seek damages or attorneys' fees based on claims asserted in other Counts.   Count Five seeks a recovery of damages by the plaintiffs jointly for loss of consortium, and Count Eight seeks attorneys' fees pursuant to 42 U.S.C. § 1988.

of $5,000,000, punitive damages in the amount of $10,000,000, and attorneys' fees and costs.  In its Memorandum and Order of May 31, 2002, this Court dismissed Count Four of the complaint which alleged a state law claim of defamation against defendants Rhoads and Sewell.

## II

### Background Facts[3]

Plaintiff Jacobs has been employed by the DNR as an Officer First Class member of the Maryland Department of Natural Resources Police ("NRP").  At the time of the matters in suit, Jacobs was cross designated as a Task Force Officer with the United States Drug Enforcement Administration ("DEA"), and was assigned to the Baltimore Washington High Intensity Drug Trafficking Area ("HIDTA").  Defendant Rhoads at the time of the matter in suit was employed by the State of Maryland as Superintendent of the NRP, and he was charged with the responsibility of overseeing and directing the affairs and operations of the NRP.[4]  Rhoads also supervised officers' conduct, training and discipline and had the authority to punish and remove officers.  Defendant Sewell is and has been employed as a member of the NRP and serves as the NRP Special Operations Commander.[5]

---

[3]The facts summarized below, where disputed, reflect plaintiffs' version of the events to the extent that it is supported by affidavits, depositions or other documentary evidence. Magnuson v. Peak Technical Servs., 808 F.Supp. 500, 504 (E.D. Va. 1992).

[4]Rhoads had the rank of Colonel while employed by the DNR.

[5]Sewell has the present rank of Major.

On April 10, 1999, Jacobs and Detective Frank Wendolek ("Wendolek"), a Maryland Transportation Authority ("MDTA") police officer working with the HIDTA, were assigned by the DEA Task Force to respond to a drug arrest at the Fort McHenry Tunnel toll plaza on Interstate 95 in Baltimore. The arrest included the seizure of suspected cocaine, currency and a handgun. Immediately following the arrest, the seized items were taken to a conference room located in the MDTA Police Headquarters at the Fort McHenry Tunnel ("MDTA Headquarters") where the items were placed on a conference room table for processing. Officer Kevin Anderson ("Anderson") and Sergeant Jorge E. Vasquez ("Vasquez") of the MDTA police force counted the currency several times and concluded that the amount which had been seized was $7,637. They recorded this figure in the chain of custody documents.

Later on the evening of the arrest, Jacobs arrived at MDTA Headquarters and went into the conference room where Vasquez was handling the seized currency. Various personnel were left alone in the room at times, and different persons came in and went out of the room several times prior to Jacobs' arrival. Soon thereafter, Jacobs was met by Wendolek who assisted him in interviewing the suspect, in conducting a preliminary records check and in securing the seized currency in an evidence bag. The evidence bag could not be sealed at that time because the MDTA did not have the proper sealing equipment. Jacobs and Wendolek were then given custody of the seized currency by the MDTA, and Wendolek signed a receipt indicating that he did not count the money or verify the amount seized. The currency had been counted by the MDTA but was not

4

counted by Jacobs or Wendolek pursuant to a DEA policy.  Jacobs and Wendolek then left the MDTA headquarters in separate vehicles. They had agreed to meet at DEA headquarters in Baltimore and place the currency in a safe after sealing the evidence bag.   The currency was transported in Wendolek's vehicle.

On April 12, 1999, Wendolek and Corporal Michael Bolewicki ("Bolewicki") of the HIDTA removed the sealed custody bag from the safe and transported it from DEA headquarters to a local bank for deposit.  Upon arrival, the currency was counted by a teller, and it was discovered that the amount of currency inside the bag was two hundred dollars less than that which had been reported in the chain of custody documents.

As a result of the discrepancy, the MDTA and the NRP initiated an investigation into the possible theft of the currency by law enforcement personnel.   Defendant Sewell was assigned to investigate the alleged theft on behalf of the NRP together with Lieutenant Sue Scanland ("Scanland") of the MDTA.  At the outset of the investigation, Scanland informed Sewell that as a result of initial  interviews with Wendolek and Vasquez, she had learned that Jacobs had been alone with the currency for approximately twenty to twenty-five minutes during the time when the money had been located in the MDTA Headquarters conference room.   Scanland in addition identified Anderson, Vasquez and Wendolek as other individuals who may have had an opportunity to take the money.

On April 27, 1999, Sewell interviewed Jacobs in the presence of Scanland and questioned him concerning his knowledge of the missing money.  Prior to the commencement of the interview, Jacobs

was served, pursuant to the Law Enforcement Officers' Bill of Rights ("LEOBOR"), with NRP Form 180A (Notification of Complaint) and NRP Form 178 (Notification of Interrogation).  The second paragraph of the Notification of Interrogation Form stated:

> In light of the aforementioned, you are hereby ordered to submit a written statement and answer all questions which relate specifically, directly and narrowly to your performance and conduct of fitness for office. This statement and your answers cannot be used against you in a later criminal proceeding but may be used against you in administrative proceedings.

After reviewing NRP Form 180A and NRP Form 178, Jacobs signed both forms, thereby waiving his right under LEOBOR to have an attorney present and agreeing to speak with Sewell regarding the missing money.  If Jacobs had refused to submit to interrogation, the NRP was permitted under LEOBOR to take "punitive actions" against him.  <u>See</u> Md. Ann. Code Art. 27, § 728(b)(7)(ii)(1996). After having been advised of his rights under LEOBOR but before being asked any questions, Jacobs handed Sewell a typewritten statement dated April 16, 1999, in which Jacobs recounted the events of April 10, 1999.  During the interview, Jacobs elaborated on his written statement and orally provided his recollection of the events that had transpired on April 10, 1999.  At the completion of the interview, Sewell asked Jacobs if he would submit to a polygraph test.  Jacobs agreed and was given an order to report for a polygraph test on the following day.  Jacobs reported for the test on the next day, and prior to the administration of the test, he signed a written statement waiving his <u>Miranda</u> rights.

6

The results of the examination revealed deceptive responses by Jacobs to questions regarding the missing money.[6]

On April 30, 1999, Jacobs was informed by Sewell that at the direction of Rhoads the investigation was being then conducted as a criminal investigation instead of an internal administrative one. Over the course of the next month or so, Sewell interviewed a number of people in connection with the investigation, including Vasquez, Wendolek and Bolewicki.  Sewell also met with Jacobs on two additional occasions.  On the first occasion, May 13, 1999, Sewell met with Jacobs at the offices of Jacobs' attorney.  Prior to questioning, Sewell reminded Jacobs that he was conducting a criminal investigation.  This fact came as a surprise to Jacobs' attorney who explained that he was unaware that the investigation was criminal in nature, that he did not practice criminal law and that Jacobs would need to hire different counsel.  The meeting promptly terminated before any questioning occurred.

The second additional meeting took place on May 18, 1999 at the office of Jacobs' new attorney, Joel Katz, Esq. ("Katz"). Prior to questioning, Sewell again explained that the investigation was criminal in nature.  Katz did not object to Sewell acting as the investigator but requested that his questioning be confined to the content of Jacobs' April 16, 1999 written statement.  During the questioning, Jacobs made certain statements which Sewell later recorded and relied upon in recommending that probable cause

---

[6]Polygraph tests were also taken by Anderson, Vasquez and Wendolek, the results of which revealed truthful exculpatory responses to questions regarding the missing money.

existed for the criminal prosecution of Jacobs. According to Jacobs and Katz, Sewell ordered Jacobs to answer his questions.

On or about June 9, 1999, Sewell prepared and completed a written report which concluded that Jacobs had stolen the missing currency. The report stated that Jacobs was the only person left alone with the money after it had been counted and that he accordingly had the opportunity to take it. As a result of the investigation, the DEA reassigned Jacobs from the HIDTA to administrative duties at NRP headquarters.

On June 23, 1999, Sewell referred the case, and delivered a copy of his June 9, 1999 report, to the Office of the Attorney General of Maryland ("OAG") for additional investigation. The OAG met with Sewell to review the case and later conducted additional interviews. On August 23, 1999, the OAG filed criminal charges against Jacobs in the Circuit Court for Baltimore City, alleging misconduct in office, obstruction of justice, and theft of a sum of money under $300. On September 7, 1999, Jacobs voluntarily turned himself in to the Maryland State Police pursuant to arrangements made by his attorney and an Assistant Attorney General. Jacobs was processed and booked on the pending criminal charges but was not detained. Jacobs was at the police station for less than forty-five minutes. Although he was present when Jacobs turned himself in, Sewell was not the arresting officer. Sewell was present solely for the purpose of obtaining Jacobs' service revolver and badge and informing Jacobs that he was being placed on administrative leave by the NRP pending the outcome of his prosecution.

On February 29, 2000, the criminal charges against Jacobs came on for trial in the Circuit Court for Baltimore City before Judge Kenneth Johnson, sitting without a jury.    Assistant Attorney General Deborah M. Levine prosecuted the case on behalf of the State.    On March 1, 2000, Jacobs was found not guilty of all charges by Judge Johnson.[7]    On March 8, 2000, Jacobs' suspension was lifted, and he was returned to full duty status.    Jacobs is currently still employed by the NRP and has suffered no loss of compensation as a result of the investigation and the criminal prosecution at issue.

After being found not guilty of the criminal charges, Jacobs filed an administrative complaint with the NRP, alleging wrongful conduct by Sewell in the performance of the investigation undertaken by him.   Jacobs alleged in that complaint that Sewell's investigation of him was biased in that it failed to follow up on all leads in the investigation and failed to derive logical inferences resulting from interviews of witnesses.   The NRP later undertook an investigation into the allegations of Jacobs' administrative complaint, and on May 21, 2001, Jacobs was informed that the NRP had cleared Sewell of any and all wrongdoing.

On June 4, 2001, Jacobs met personally with Rhoads and informed him of the allegedly biased nature of the investigation. Jacobs asked Rhoads to negate the findings made by Sewell during

---

[7]Judge Johnson did not in rendering his verdict discuss the evidence presented at the trial but merely stated his conclusion that the prosecution had not proved beyond a reasonable doubt that Jacobs was guilty of the charges brought against him.

his investigation, arguing that they were flawed and did not reach a logical and just conclusion. After personally reviewing the documents generated by Sewell's investigation, Rhoads denied Jacobs' complaint and allowed Sewell's findings and conclusions to stand.

On December 14, 2000, Jacobs sent a letter to the Maryland State Treasurer, giving notice of a claim being asserted by him against the NRP under the Maryland Tort Claims Act. This civil action was filed in the Circuit Court for Baltimore City on February 1, 2002 and was removed to this Court on April 22, 2002.

### III

### Summary Judgment Principles

A party moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. Barwick v. Celotex Corp., 736 F.2d 946, 958 (4th Cir. 1984). Where, as here, the plaintiffs must bear the ultimate burden of persuasion at trial, "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

One of the purposes of Rule 56 of the Federal Rules of Civil Procedure is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. See Rule 56(e).

10

If the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." Catrett, 477 U.S. at 322, 323.

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.'" Barwick, 736 F.2d at 958-59 (quoting Seago v. North Carolina Theatres, Inc., 42 F.R.D. 627, 640 (E.D.N.C. 1966), aff'd, 388 F.2d 987 (4th Cir. 1967)). A genuine issue of material fact cannot be created "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Moreover, only disputed issues of material fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the absence of a minimal showing by a plaintiff that a defendant may be liable under the claims alleged, a defendant should not be required to undergo the considerable expense of preparing for and participating at a trial. See Anderson, 477 U.S.

11

at 256-57; <u>Catrett</u>, 477 U.S. at 323-24.  Indeed, the Fourth Circuit
has stated that, with regard to motions for summary judgment, the
district courts have "an affirmative obligation. . .to prevent
'factually unsupported claims and defenses' from proceeding to
trial."  <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th
Cir. 1987) (quoting <u>Catrett</u>, 477 U.S. at 323-24).

IV

<u>Plaintiffs' Federal Claims</u>

Only Count VII of the complaint asserts claims brought under
federal law.  In Count VII, plaintiffs allege that defendants
Rhoads and Sewell, acting under color of law, deprived Jacobs of
various rights guaranteed by the United States Constitution and
that these defendants are therefore liable in damages under 42
U.S.C. § 1983.  It is claimed that Jacobs' Fifth Amendment rights
were violated: (1) when defendant Sewell used statements compelled
from Jacobs as part of the NRP's criminal investigation; (2) when
defendant Sewell forwarded his investigative report to the OAG; and
(3) when defendant Rhoads directed Sewell to conduct a criminal
investigation of Jacobs and allowed Sewell to refer his
investigative report to the OAG.  It is further claimed that
Jacobs' Fourth Amendment rights were violated when he was subjected
to an unreasonable seizure as a result of the criminal charges
filed against him and his subsequent criminal prosecution.

(a)

<u>Fifth Amendment</u>

The Fifth Amendment to the United States Constitution provides

12

in part: "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amend. V.  "The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77 (1973).  The Fourteenth Amendment applies this restriction to the states.  Malloy v. Hogan, 378 U.S. 1, 6 (1964).

The Supreme Court addressed the scope of the Fifth Amendment rights of public employees in the following three cases: Garrity v. New Jersey, 385 U.S. 493 (1967); Gardner v. Broderick, 392 U.S. 273 (1968); and Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 392 U.S. 280 (1968).  In Garrity, certain police officers were compelled, under threat of termination, to answer questions regarding allegations that they were involved in "fixing" traffic tickets. 385 U.S. at 494.  The officers answered the questions, and some of their answers were later used over their objections in subsequent criminal prosecutions.  Id. at 495.  The Court held that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights" and therefore "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office."  Id. at 500.

In the companion cases of Gardner and Uniformed Sanitation

13

Men, public employees were questioned about alleged misconduct on the job and advised that refusal to answer and sign waivers of immunity would lead to dismissal.  392 U.S. at 274-75; 392 U.S. at 281-82.   The employees refused to provide statements and were subsequently fired.  Gardner, 392 U.S. at 273; Uniformed Sanitation Men, 392 U.S. at 280.  The Court held that the employees could not constitutionally be given the "Hobson's choice between self-incrimination and forfeiting [their] means of livelihood." Gardner, 392 U.S. at 277.  The Court explained, however, that where an employee refuses to answer "questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself," the privilege against self-incrimination does not bar his dismissal.  Id. at 278; Uniformed Sanitation Men, 392 U.S. at 284.

In interpreting these Supreme Court decisions, the Fourth Circuit has observed that the Supreme Court "was careful to preserve the right of a public employer to question an employee about matters relating to the employee's job performance."  Wiley v. Mayor and City Council, 48 F.3d 773, 777 (4th Cir. 1995).  In Wiley, Justice Powell, sitting by designation with the Fourth Circuit, explained that the language of Gardner and Uniformed Sanitation Men "strongly indicates that forcing a public employee to answer potentially incriminating job-related questions does not implicate the Fifth Amendment unless the employee is also compelled to waive his privilege."  Id. Justice Powell further explained that

14

"the state may compel job-related testimony from an employee in the course of a criminal investigation, provided, of course, that the state does not make direct or derivative use of the employee's statement against the employee in any criminal proceeding."[8]  Id. (citations omitted).

In order to prove in this case a violation of Jacobs' Fifth Amendment rights, plaintiffs must show not only that statements were compelled from Jacobs, but also that defendants Sewell and Rhoads made direct or derivative use of those compelled statements against Jacobs in a criminal proceeding.  The Fourth Circuit so held in Wiley v. Doory, 14 F.3d 993, 996 (4th Cir. 1994), stating that "the right against self-incrimination is not violated by the mere compulsion of statements, without a compelled waiver of the Fifth Amendment privilege or the use of the compelled statements against the maker in a criminal proceeding." (Emphasis added) Plaintiffs argue that the immunity afforded to Jacobs' compelled statements barred use of those statements not only in a criminal proceeding, but also in the criminal investigation undertaken by Sewell and Rhoads.  This Court must disagree.

Plaintiffs' rely on Kastigar v. United States, 406 U.S. 441 (1972), in support of their contention that a Fifth Amendment violation occurs when an employee's compelled statements are used

_____

[8]The Court also found that the immunity given to compelled statements was "self-executing."  Id. at 777 n.7 (citing Hester v. City of Milledgeville, 777 F.2d 1492, 1496 (11th Cir. 1985)). Therefore, absent waiver, the immunity automatically attaches to compelled incriminating statements as a matter of law.  Hester, 777 F.2d at 1496.

during a criminal investigation.  In <u>Kastigar</u>, the Supreme Court upheld the constitutionality of the federal use immunity statute, 18 U.S.C. §§ 6002-6003, concluding that the statute "leaves the witness and prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment."  <u>Id</u>. at 462.  In so holding, the Court found that the immunity granted under the federal statute in question provided "a comprehensive safeguard, barring the use of compelled testimony as an 'investigative lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."  <u>Id</u>. at 460 (citations omitted). However, at no point did the Court hold, as plaintiffs contend, that a Fifth Amendment violation occurs when compelled testimony is used during a criminal investigation undertaken by police officers.  Indeed, the Supreme Court held in <u>Kastigar</u> that the prohibition against the use of compelled statements applies only to prosecutors and indicated that a Fifth Amendment violation does not occur until a person is charged with a crime and goes to trial. <u>Id</u>. at 453.  As the Court stated, the privilege against self-incrimination "prohibits the prosecutorial authorities from using the compelled testimony in <u>any</u> respect." (Emphasis in original).

Although the Fourth Circuit has not specifically defined the phrase "criminal proceeding," <u>Wiley</u> indicates that a criminal investigation by police officers is not simply a subpart of a criminal proceeding as plaintiffs contend, but is instead a separate and distinct event.  <u>See</u> 48 F.3d at 777 (explaining that "the state may compel job-related testimony from an employee in the

16

course of a criminal investigation, provided, of course, that the state does not make direct or derivative use of the employee's statement against the employee in any criminal proceeding.").

Citing <u>Kastigar</u>, the Supreme Court has stated that "[a]lthough conduct by law enforcement officials prior to trial may ultimately impair [the privilege against self-incrimination guaranteed by the Fifth Amendment], a constitutional violation occurs only at trial." <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 264 (1990) (<u>citing Kastigar</u>, 406 U.S. at 453); <u>see also</u> <u>Riley v. Dorton</u>, 115 F.3d 1159, 1164-65 (4th Cir. 1997) (agreeing with the Supreme Court that a Fifth Amendment violation occurs only when compelled statements are used at trial).

Plaintiffs place heavy reliance on <u>United States v. Hubbell</u>, 530 U.S. 27 (2000) in arguing that defendants Sewell and Rhoads are responsible for the derivative use of Jacobs' compelled testimony during the criminal prosecution.  In <u>Hubbell</u>, the Supreme Court noted that the Fifth Amendment's protection "encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence."  <u>Id</u>. at 37.  But <u>Hubbell</u> was concerned with a prosecutor's use of evidence derived from a compelled statement in obtaining an indictment and preparing the case for trial. <u>Id</u>. at 41.  The issue here is quite different and was not addressed in <u>Hubbell</u>.  What must be determined in this case is whether a police officer's obtention  of compelled statements during an internal criminal investigation undertaken by his employer triggers a Fifth Amendment violation.  Defendants did not

17

make actual or derivative use of the compelled statements in question in a criminal proceeding because they did not prepare the criminal charges brought against Jacobs nor did they decide what evidence would be presented at the trial.  It was only through the actions of the prosecutor in Jacobs' case, an Assistant Attorney General of Maryland, that Jacobs' Fifth Amendment rights were, or could have been, violated.

Based on the authorities cited hereinabove, this Court is satisfied that a criminal investigation undertaken by police officers is not simply a subpart of a criminal proceeding, but is instead a separate and distinct event.  This Court concludes that the named defendants did not themselves use compelled testimony of Jacobs in a criminal proceeding.  Such use did not occur until criminal charges were prepared by the prosecutor and brought against Jacobs, and when the challenged testimony was used during such preparation and at the trial[9] by the Assistant Attorney General who prosecuted the case.

The facts of this case are similar to those in <u>Gwillim v. City of San Jose</u>, 929 F.2d 465 (9th Cir. 1991) and <u>Pirozzi v. City of New York</u>, 950 F.Supp. 90 (S.D.N.Y. 1996).  In <u>Gwillim</u>, a police officer was accused of making sexual advances towards a fellow police officer.  929 F.2d at 466.  The police department began an investigation into the incident during the course of which they

---

[9]At the trial, Jacobs' attorney did not object to the introduction into evidence of Jacobs' written statement of April 16, 1999.  Counsel's objection to oral statements made by Jacobs on May 18, 1999 was overruled by Judge Johnson.

questioned the plaintiff on two occasions, after warning him on each occasion that if he did not answer he could be removed from office.  Id.  Transcripts from both interviews were then sent to the Deputy District Attorney assigned to prosecute criminal proceedings against police officers.  Id.  Plaintiff sued the City of San Jose, the City Attorney and the Police Chief for the City of San Jose, alleging that the disclosure by defendants of his immunized statements to the prosecutor violated his Fifth Amendment right against self-incrimination.  Id. at 467.  The district court granted the defendants' motion for summary judgment, and the Ninth Circuit affirmed.  Id. at 467-68.  The Ninth Circuit explained that a prosecutor's access to immunized testimony is not a violation of the privilege against self-incrimination.  Id. at 468.  The Court determined that there was no evidence that the defendants could have anticipated the manner in which the prosecutor would use the information and stated that "it was not [the defendants'] responsibility to assure that [the prosecutor's] use of the information complied with the Constitution."  Id.

Similarly, in Pirozzi, two police officers were the subject of an investigation by the New York City Police Department which was the result of a civilian complaint made against them.  950 F.Supp. at 92.  The officers were interviewed as part of the investigation and were informed that their statements could not be used against them in any subsequent criminal proceedings.  Id.  Shortly after the plaintiffs were interviewed, the Kings County District Attorney's Office, in connection with its own investigation into the officers, served a subpoena on the police department seeking

19

all records relating to their investigation. <u>Id</u>. The police
department complied with the subpoena and the District Attorney's
office eventually filed criminal charges against the officers. <u>Id</u>.
The officers brought a § 1983 suit against the City of New York and
the New York City Police Department alleging that these defendants
violated the plaintiffs' Fifth Amendment rights by producing the
records of its investigation to the district attorney. <u>Id</u>. at 91.
Relying on <u>Gwillim</u>, the Court granted summary judgment for the
defendants, explaining that mere access of the prosecution to
immunized testimony does not violate the Fifth Amendment and that
the police department therefore could not have violated the
Constitution by merely producing statements to the district
attorney. <u>Id</u>. at 93.

When the facts of record here are viewed in the light
favorable to the plaintiffs, it is apparent that their Fifth
Amendment claims are based solely on actions taken by defendants
during a criminal investigation which was concluded prior to the
filing of criminal charges against Jacobs. Because defendants were
not involved in the preparation and filing of criminal charges
against Jacobs and because they did not conduct the criminal
prosecution of him, they could not have violated Jacobs' Fifth
Amendment rights. Furthermore, as <u>Gwillim</u> and <u>Pirozzi</u> make clear,
the Fifth Amendment did not prohibit defendants from providing
Sewell's report to the OAG, and did not require that defendants
take steps to ensure that the OAG used the information provided in
a manner consistent with the Constitution. It is clear from the
record here that it was only through the actions of the OAG and not

those of the defendants that Jacobs' Fifth Amendment rights could have been or were violated.  Accordingly, plaintiffs' claim under § 1983 that defendants violated Jacobs' Fifth Amendment rights must fail.[10]

(b)

Fourth Amendment

The Fourth Amendment to the United States Constitution provides in part: "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. Amend. IV.  "A law enforcement officer who neither physically restrains a suspect nor implicitly or explicitly threatens to use force to detain him has not 'seized' him within the meaning of the Fourth Amendment."  Myers v. Shaver, 2003 U.S. Dist. LEXIS 2547 (W.D.Va. February 19, 2003).

Plaintiffs argue that because defendants conducted a criminal investigation which did not develop probable cause in the absence of the use of compelled statements, their actions in assisting in the criminal prosecution of Jacobs ultimately led to the seizure of Jacobs in violation of the Fourth Amendment.  Plaintiffs' argument has no merit.

An official can be liable for a constitutional deprivation only "where it is affirmatively shown that the official charged

---

[10]Plaintiffs' claim against defendant Rhoads is based on the assertion that Rhoads approved the investigative methods of Sewell and is therefore equally culpable.  Since the Court has concluded that Sewell did not violate Jacobs' Fifth Amendment rights, plaintiffs' claim against defendant Rhoads must likewise fail.

21

acted personally in the deprivation of rights." De Ventura v. Keith, 169 F.Supp.2d 390, 395 (D. Md. 2001) (citations omitted). Defendants must have had "personal knowledge of and involvement in" the deprivation of Jacobs' Fourth Amendment rights in order to be liable. See id. (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985)). The record here clearly establishes that neither Sewell nor Rhoads arrested Jacobs. Rhoads was not even present when Jacobs voluntarily turned himself in to the Maryland State Police. Sewell was present solely for the purpose of obtaining Jacobs' badge and service revolver and informing him that he was being placed on administrative leave. These acts did not constitute a "seizure" of Jacobs by defendants in violation of the Fourth Amendment. Accordingly, plaintiffs' claim that defendants violated Jacobs' Fourth Amendment rights must also fail.

(c)

Qualified Immunity

Defendants argue in the alternative that even if the Court were to conclude that they violated Jacobs' Fifth Amendment rights, they are entitled to qualified immunity under the circumstances present in this case. This Court would agree. On the record here, this Court concludes as a matter of law that Sewell and Rhoads are entitled to qualified immunity because their conduct did not violate any clearly established Fifth Amendment right.

Government officials performing a discretionary function "generally are granted qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

22

which a reasonable person would have known.'" <u>Wilson v. Layne</u>, 526 U.S. 603, 614 (1999)(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).   In determining whether the right was clearly established, "the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." <u>Pritchett v. Alford</u>, 973 F.2d 307, 312 (4th Cir. 1992).  The unlawfulness of the official's actions must be apparent in light of pre-existing law. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1986).  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." <u>Maciariello v. Sumner</u>, 973 F.2d 295, 298 (4th Cir. 1992)(citing <u>Anderson</u>, 483 U.S. at 639-640).

In arguing that defendants are not entitled to qualified immunity, plaintiffs contend that <u>Garrity</u> and <u>Wiley</u> clearly establish that a public employee's compelled statements cannot be used in a subsequent criminal proceeding against the employee. <u>See</u> 385 U.S. at 500; 48 F.3d at 777.  This Court would agree.  However, this case is not directly controlled by the principles enunciated in those cases.  Defendants  Sewell and Rhoads used Jacobs' compelled statements <u>in a criminal investigation</u> and subsequently turned over the results of their investigation to the OAG. Defendants were not involved in the OAG's decision to prepare and file criminal charges against Jacobs, and defendants did not conduct the criminal prosecution of Jacobs.  The question therefore before the Court is whether pre-existing case law clearly establishes that <u>Garrity's</u> prohibition of the use of a public employee's compelled statements extends to criminal investigations.

This Court concludes that preexisting law did not clearly prohibit the use of such statements by police officers in a criminal investigation.  See Gwillim, 929 F.2d at 468; Piozzi, 950 F.Supp. at 94.

In their memorandum, plaintiffs have cited no case holding that the obtention of compelled statements by police officers during a criminal investigation constitutes use during a "criminal proceeding," when, as here, the investigation was concluded prior to the filing of criminal charges against the plaintiff.  Moreover, as discussed hereinabove, pre-existing case law indicates that a criminal proceeding and a criminal investigation are two separate and distinct events, see Wiley, 48 F.3d at 777, and that a criminal proceeding does not commence any time before criminal charges are prepared by a prosecutor and filed against the public employee in question.  See Kastigar, 406 U.S. at 453; Verdugo-Urquidez, 494 U.S. at 264.  This Court is accordingly satisfied that, contrary to plaintiffs' assertion, pre-existing case law does not suggest that defendants' conduct violated clearly established constitutional rights of which a reasonable person would have known.

For the foregoing reasons, this Court concludes that even if such right existed, the specific Fifth Amendment constitutional violation alleged in this case, even if such a right exists, was not clearly established at the time the events in question occurred.  Accordingly even if in any event a valid § 1983 claim could be asserted against defendants Sewell and Rhoads, these defendants under the circumstances here possess a qualified

immunity which bars any recovery of damages by plaintiffs.[11]

V

## Plaintiffs' State Law Claims

There remain plaintiffs' pendent state law claims asserted in Counts One, Two, Three, Five and Six of the complaint. Pendent jurisdiction is a doctrine of discretion and not one of a plaintiff's right. United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). However, the Supreme Court has expressly cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal law claims are dismissed before trial . . . the state claims should be dismissed as well." Id. at 726. The principles of Gibbs have been codified under the name "supplemental jurisdiction." 28 U.S.C. § 1367.

Here, summary judgment in favor of defendants Rhoads and Sewell is being entered as to the only federal claims asserted in the complaint. A court may decline to exercise supplemental jurisdiction if all claims over which it has original jurisdiction have been dismissed. 28 U.S.C. § 1367(c)(3). A majority of the courts which have considered the question have declined to exercise pendent jurisdiction over state claims when the federal claims have been disposed of prior to a full trial on the merits. See Hector v. Weglein, 558 F. Supp. 194, 204-205 (D. Md. 1982). Outlining the

---

[11]For similar reasons, defendants are also entitled to qualified immunity insofar as plaintiffs' Fourth Amendment claims against both defendants are concerned.

relevant   factors   to   be   considered   in   determining   the
appropriateness of a court's exercise of its discretion to decide
pendent state claims, Judge Friendly in <u>Kavit v. A. L. Stamm & Co.</u>,
491 F.2d 1176, 1180 (2d Cir. 1974) said the following:

> If it appears that the federal claims . . .
> could be disposed of on a motion. . ., the
> court should refrain from exercising pendent
> jurisdiction absent exceptional circumstances.

<u>Id</u>. at 1180.

Since summary judgment in favor of defendants Sewell and
Rhoads is being granted as to plaintiffs' federal claim, and since
there are no exceptional circumstances here, this Court will not
exercise pendent jurisdiction in this case over Counts One, Two,
Three, Five and Six. Accordingly, these state law claims will be
dismissed, without prejudice to plaintiffs' right to assert these
claims in a state court.

VI

Conclusion

For all the reasons stated, the motion for summary judgment of
defendants Rhoads and Sewell will be granted as to plaintiffs'
federal claim,[12] and plaintiffs' state law claims will be dismissed
without prejudice.   An appropriate Order will be entered by the
Court.

---

[12]Summary judgment in favor of defendants will also be granted
as to Count Eight which seeks an award of attorneys' fees under 42
U.S.C. § 1988.

26

_____/s/_____
**Alexander Harvey, II**
**Senior United States District Judge**

**DATED:** _April 14, 2003_